Ladies and gentlemen, we have six cases on the calendar this morning. The patent case, two cases from the Court of Federal Claims, two employee cases, veterans case, one of the employee and one of the claims cases are submitted on the briefs and will not be argued. But before we get to that official business, we have an event in which no one wins and no one loses. Well, no one loses, everyone wins. Everyone wins. It's a win-win situation. Judge Graiazza has a motion to make. Thank you, Judge Lori. I would like to move the admission of my law clerks to the membership of the Bar of this Court. First motion is the admission of Christopher Funk, who is a member of the Bar in good standing of the highest court of the state of Virginia. Second one is Tiwa Wong, who is a member of the Bar in good standing of the highest court of the state of New York. Emily Curtis Johnson, who is a member in good standing of the highest court of the state of Illinois. Nathan Speed, who is a member in good standing of the highest court of the state of Massachusetts. I acknowledge their credentials and am satisfied that each one of them presents the necessary qualifications. I could speak about their credentials all day long, but that would take at least four or five hours, and we have four cases to review this morning. But I can attest to their individual brilliance, intelligence, and diligence. And I now move their admission to the Court of the Federal Bar. Judge Lori? Judge Bryson? Judge Bryson and I unanimously concur and grant the motion. If you will step forward and have the clerk administer the oath to you. I'm sorry, that's how you turn it. I'm glad you didn't forget. I didn't forget. Welcome to the Court of the Federal Bar. Congratulations. We welcome you and look forward to seeing you in the future, either before us or in the briefs, and wish you a successful career. Thank you, Judge Lori and Judge Bryson. We now proceed to the business at hand, where unfortunately not everyone wins. First case is American Calcar v. American Honda, 2009, 1503, 1567. Mr. Butter? Yes. You've got a lot of patents to deal with. I'm sure you'll be economical and won't let your argument get to what you think you need to say. Thank you, Your Honor. Good morning. May it please the Court. First, I will discuss inequitable conduct. The district court abused its discretion in several respects, requiring reversal. First, by repeatedly improperly equating knowledge with intent. There is no evidence of intent, just pure conjecture based on inferred knowledge. The court inferred intent, didn't it, in quite an extensive discussion based on what it thought the inventors knew or the corporation knew? And didn't it make credibility findings? Well, Your Honor, you're right with respect to the fact that the inferences, almost all the inferences, go to what knowledge, mostly what the corporation had and also what the inventors had. The court only addresses two issues of credibility. And in both instances, the problem was that the district court ignored a key fact. And the key fact is undisputed in the record that Mr. Obradovich, at the time that the patent application was being prepared, was having his art department prepare an interactive mock-up to show to Honda to be a business partner with Honda. And thus, he wanted it to have the look and feel of the Acura system. And that's exhibit O-F at trial. So the point is that it wasn't mere happenstance that some of the figures looked like the Acura RL. It was by design. And, in fact, the background of the invention reveals that Figure 2 was derived from the Acura RL system. But was it disclosed? Yes, Your Honor. In the patent application, it states that the Figure 2 is a faceplate that is derived from the Acura navigation system. So that's with respect to the court basically said that there's an inconsistency because he didn't know. He couldn't say why there were similarities. Well, that's not accurate. He knew why they were similar, and he disclosed it to the patent office in the background of the invention. The only other issue of credibility raised by the district court was the fact of this Motor Trend article, which is admitted even by Honda not to be material. So that is not meaning that Mr. Obradovich is not being candid because the background of the invention, in any event, was prepared by the patent attorney. Mr. Broderick, you're aware that we have an inequitable conduct case on Bonk? Yes, Your Honor. I'm aware of that. Obviously, you'd prefer to win here. That's the same assumption. Yes. However, what is your comment as to the wisdom of staying the case or holding it until we hear ferocence? Well, I guess my view is, Your Honor, anything that will help me win I would be for. But I would also say that notwithstanding what is decided by the Federal Circuit on Bonk, that even with the current law, American Calcar should still prevail. But it's fair to say that ferocence isn't likely to be decided, given that it's an in-bank case. It takes time to hear it, write it, until 2011. Is that a substantial obstacle to the business goals of your client? Your Honor, the most important business goal of my client is to win this case. And so that's the best way that I can state that. I've heard business people say, we'd rather win, but win or lose, we want to know so we can move on. Your Honor, I must concede that I haven't asked that specific question of the client, but the client wants to win the case. I'll let you get back on the track. Okay, thank you, Your Honor. So in addition to improperly equating knowledge and intent, the Court made inferences that were not based on predicate facts found by clear and convincing evidence. The third problem with the Court was ignoring the other equally reasonable or more reasonable explanations of the nondisclosure. And by ignoring key facts such as the interactive mock-up I just mentioned. Fourth, the District Court abused its discretion on the issue of intent by improperly lumping together the three inventors and a company. A company cannot be found to have committed inequitable conduct. I count 12 times that the District Court says that either the company, Calcar, had or did something. Now, with regarding the predicate facts, in establishing what Calcar, the company, and the inventors knew, the District Court stated things such as the exact source of this information is unclear. Both inferences are reasonable. Exactly what the inventors did in the RL is unclear. These cannot form the basis for meeting a clear and convincing evidence standard. What's your comment on the fact that the jury in advisory opinion of it said no inequitable conduct? I have a lot to say about that, Your Honor. I thought you might. Well, first, this Court has said in the Star of Scientific that the need to strictly enforce the burden of proof and elevate standard of proof in the inequitable conduct context is paramount because of the penalty for inequitable conduct is so severe. The jury was impaneled to hear the evidence, deliberate, and come to a decision where they found no clear and convincing evidence of inequitable conduct. Of course, we have no reasoning from the jury as we do from the District Judge. We do have some reasoning, Your Honor, and if I could get to that in one second and say that to disregard that verdict, the District Court had to find no reasonable jury could disagree. Anything less would be inconsistent with the law that to meet the clear and convincing burden, the inference of intent to deceive must be the single most reasonable inference. Now, the advisory jury was agreed upon to be advisory, and I understand our case law to be that that does not impose any restriction on the District Courts reaching a contrary conclusion sitting as the finder of fact in this equitable proceeding. That, I thought, was settled law. Do you take issue with that proposition? Yes, Your Honor. In the Durrell last case, it was the flip situation in which the court found that the jury's finding of materiality and intent didn't reach the clear and convincing standard. Here, there's a very high standard, and in fact, under Starr Scientific, it has to be— Let me make sure I understand what you're saying. You're saying, then, that an advisory jury that finds no inequitable conduct is binding on the District Judge, but an advisory jury that finds inequitable conduct is not binding on the District Judge. Is that your legal proposition? Not exactly. My legal proposition is that it would have to be that the court would have to conclude that no reasonable jury could disagree. Well, binding subject, of course, to a JMAL. Setting aside the JMAL situation, you're saying that it's a one-way street, but if the jury finds no inequitable conduct, that setting aside JMAL, that that's it, right? Yes, Your Honor. Even if it's an advisory jury. That's contrary to what my understanding of the law of advisory juries in equitable situations has always been, but that's your submission, right? Yes, but, Your Honor, it's also related to the fact that for eight unanimous jurors to find that there was not clear and convincing evidence of inequitable conduct, the District Court, at a minimum, had to consider that evidence as whether the District Court's theory of inequitable conduct reaches the level of being the single most reasonable inference. Clearly, it wasn't, because eight jurors unanimously disagreed with the District Judge, but also to get to Your Honor's question about all we know is that the jury said there was no inequitable conduct, we do have more information, because with respect to the 497 patent, the jury invalidated the patent, the 497 patent, based on the RL navigation system that was in evidence that the jury saw demonstrations of, that the jury even had in the jury box. But you haven't appealed that patent, have you? 497 is not before us on appeal. That's correct, Your Honor, but what my point is, is that clearly the jury thought it was material, because they found it was anticipatory. So if they found that there was no inequitable conduct, it must have been because the RL and the manual and the photos, their nondisclosure to the patent office was not done with an intent to deceive. So for that patent, it had to rely on the fact that they believed Mr. Obradovich, or at least to the point that they didn't think that he withheld anything with an intent to deceive. And that's a credibility determination. That's the job of the jury. And it is against our judicial process in the jury system for a jury to necessarily decide a credibility issue and to have the district court just disregard it. I'm in my rebuttal time, so... We'll save it for you. Thank you, Your Honor. Mr. Hillman, I'm sure you know, as an experienced practitioner, that when you have a cross appeal, which you do, and I say this so you can allocate your time now, because anything you say, the cross appeal will be limited to the cross in response, will be limited to the cross appeal and to respond to what your opponent tells us. Good morning, Your Honor. Good morning, Your Honor. Good morning, Mr. Court. What I plan to do is to present my cross appeal, and I'll have three minutes for that. Just on the issue of deference to the advisory, I'm surprised to hear this discussion because that oral argument, the judge said to Mr. Butter, there is no standard calling for deference to the verdict, and Mr. Butter said that was accurate. And, of course, that is set in law. So, unless the Court has further question on that issue, I'll move on. The essence of the problem here on inequitable conduct for CalCAR is that Mr. Obradovich had the RL. He sat in it. He operated it. He viewed it as the base platform for his invention. He disclosed some information about it, the faceplate, but that information that he disclosed in his patent has nothing whatsoever to do with the invention. He failed to disclose a wealth of material information, including the information that has now been agreed anticipates the 497 patent, including all the search functions, figure 17, figure 18, figure 9. If you look in our brief and compare those, all of that is the stuff that the judge looked at. This is an unusual disclosure question because there was a disclosure of the existence of the car. Exactly. But the question that I have is what would be the format, both the content and the form, of the disclosure that you think he should have made? That is to say, I take it that he should have called attention to the owner's manual. Certainly. How would he, other than driving the car over to the PTO and parking it in the employee parking lot for the examiner to look at, what else should have been done with respect to disclosure and what would have been the form of that disclosure with respect to features of the RL? Actually, Your Honor, I think the solution to that disclosure problem is a slightly different one, which is that you don't go in and claim as your own invention stuff that you saw in the prior article. Yeah, but that's a validity problem. What's the disclosure problem? I mean, setting aside, assuming that... Yeah, I think that where he described three statuses, for example, and the blue and yellow colors that he clearly took from the RL, he could have said that that was in the RL and that my invention is something more than that. It's all in the text. The problem is he didn't attribute the descriptions that he's got in the text to the RL, just as he did attribute Figure 2, which has nothing to do with the invention. The rest of it was disclosed, but disclosed as if it was his instead of the RL's. So what if he had submitted the entire operating manual? Would that have worked? It would almost have done it. The one thing is that the operating manual doesn't have the blue color that designates the third status. It doesn't have the beep. And so he would have had to acknowledge that that information also was in the RL. But the operating manual was never submitted to the patent. Absolutely not. And the court found, in spite of the denials at trial, that he had the manual. So what we've got here really is a credibility situation. We have a partial disclosure of irrelevant information, no attribution of the truly material information, and an effort at trial to deny knowledge of the material information that the court found to be not credible. And this is a very parallel situation to the Monsanto decision, which the judge relied on in finding a conclusion of Law 27. And if I could just take a minute to go through that decision. There, an explanation was offered for nondisclosure. The only explanation was that the notes in question were not supposedly disciplined. The district court, however, I'm quoting from the opinion, found this explanation to lack credibility. And the court went on, this court went on to say, credibility determinations by the trial judge can virtually never be clear error, citing the Supreme Court Anderson v. City of Bessemer case. Absent a credible reason for, you know, the district court did not clearly err in inferring requisite intent. But was there an advisory opinion in the Monsanto case? I forget. There was not. There was no advisory jury opinion. Not that I remember. I don't remember that either. But the credibility finding by the judge in Monsanto, obviously, was very difficult to overcome. Yes. Here we have the advisory opinion of the jury. We do, but a couple of things there. We don't know what the jury had in mind in denying this. I know there was a lot of talk about Mr. Yip, the attorney, possibly losing his license. We never accused Mr. Yip of inequitable conduct. Maybe the jury was fearful of going that far. But an important thing is that the judge had a lot more information in front of him at the bench hearing than the jury had. The judge called for two rounds of briefing. The whole issue of the motor trend excuse that they offered as the source of some of this information was never argued before the jury. It was argued to the judge at his request. And the judge asked for the submission of all the deposition testimony, not only in this case but in the BMW case, and he had that available. Well, I appreciate that you're responding to a question on this, but I understand your basic legal position to be here, that the advisory jury's conclusions are no more relevant than the conclusions of the eight court watchers who were sitting in the back of the courtroom. Absolutely, Your Honor. And all of whom agreed that Calcar should win the case, that once it's an advisory jury, they're just spectators. I totally agree. The judge may find them interesting or may not. And that's legally, they have no consequence. Isn't that correct? That's right. My comment was really about to suspend his point that in addition to the law, he had a lot of information that the jury didn't have. And so I guess, let's see, I've got a few more minutes here. Let me ask you before you expire, I'm sorry, before you run out of your time, your choice of words. I'm about to expire, Your Honor. Well, this won't cost you two. I do have a couple of questions. First, with respect to the service provider infringement issue, I want to focus in on the district court relied on the prosecution history of Stoppel with respect to doctrine of equivalence on the Bunn reference. Yes, Your Honor. We're on the same track here. You allude to that in your brief, but you don't specifically rely on that. Do you think that that argument holds up? I think it does, Your Honor. Even though, and here's my question, even though Bunn, as described in the prosecution history, dealt, at least to the extent that it's pertinent to the question of whether a person's intervention matters, dealt with the purchases of objects through the display, quite a different matter, and was distinguished on that ground in significant part. Why do you think Bunn creates an estoppel? Because the argument that was made there, distinguishing Bunn, was that the information didn't come up in consequence of a condition of the car, but rather came up only in consequence of the driver asking for the information. And that's exactly the situation that they're trying to now cover. In the accused vehicles, there may be a maintenance condition that the car warns you about, but it does nothing to go and search for the nearest provider unless and until the driver asks it to. It's that simple. So we have a situation where it's the driver's request that produces the information about the nearest provider. In the patent, it's an automatic situation. As soon as the condition occurs, the processor automatically, behind the scenes, finds that nearest provider. I understand how it works. My second question is with respect to the radio patent. I take it that XM, and this is a little unclear from the record, because some of the records seem to be borrowing from Sirius, which is alleged in the BMW case, which is alleged to operate in a similar manner, but I take it that the XM signal is multiplexed from a variety of original sources. Is that correct? The record doesn't give the details about how it happens, but a new signal is created from the content of the old signal. Multiple new signals, which are sent up to the satellite, or a single one? No, I believe it's a signal that goes up to the satellite, which on it has multiplexed all the information. My description is that there is a band, 12.5 band, that is used to send signals up to the satellite. It's very sketchy in the record, so I wanted to make sure that I understood how it works. Are we sending multiple signals within that 12.5 band? Or is the record simply silent on that? The record is really silent, except to the extent that there is a single signal that comes out of the DC operation that goes up there and is then reflected back. And when it comes back, it's sent to repeaters? Yes, it is, but it's the same signal. Well, yes. It's the same content. It's the same signal, really, in the sense that I recognize that you could call a repeater situation a different signal, but it really is the same signal that's just repeated. That's very different from taking content from multiple signals and putting that content together and creating a new signal out of it. Even though you're repeating that signal, it's still one signal coming down from the satellite. I think that's right, Your Honor, because all of these signals get repeated at some point. I've got very little time. I wanted to make a comment. On your cross-appeal? Yes. I'll give you a couple of extra minutes. Thanks. The main thing I wanted to add to my brief here, or clarify in the brief, because some people have read our briefs and have been confused about it, our claim construction argument is this. We're not trying to read in a limitation to the knowledgeable user. Our position is that the patent simply doesn't require a non-knowledgeable user, and the judge, when he made his summary judgment in JMAL decisions, in effect read in a requirement that the prompting be adequate to prompt somebody who doesn't know how the system works. All we're saying is the claim is really generic. It covers not prompting knowledgeable users, which Dr. Caird agreed had to be the case for the only embodiment of the patent. It covers prompting unknowledgeable users. Give us two minutes on your cross-appeal. Two minutes right now? Yes. And still would I have a couple of minutes for rebuttal? Well, we'll think about that. Okay. How well do you respect the two minutes? Right. And so the point is that the prior art plainly, I think, is adequate to prompt a knowledgeable user. It's true that the only difference between the prior art and the embodiment in the patent is that the prior art provides an affirmative mechanism for sort of opting out of the situation and declining the option to get the coping information. But any knowledgeable user would understand that he's been warned of the problem, he has the option to get information about how to cope with it, and he's also got this other button that he can push if it's not convenient to get the information. That doesn't neutralize the prompting. I mean, we all use computers where we're guided through processes and prompted to do this, do that, and typically there's an option in there to opt out and go back to it another day. That doesn't change the effectiveness of the prompter. And so once we agree, as Dr. Caird did, that we have a knowledgeable user here, the judge's original denial of summary judgment is in error. He clearly thought that you had to prompt somebody who was not knowledgeable, and he didn't explain his denial of JAMAL, but at the charge conference he made it clear that he was sticking with the reasoning of his summary judgment opinion, and so we say the error here was simply a case of his reading into the claim something that he hadn't even told the jury was in there, namely the requirement of a knowledgeable user. We will give you your three minutes of rebuttal time on the cross-appeal. Your Honor, Mr. Hillman, well, the point is with respect to materiality of the manual and the photos. The district court in paragraph 44 makes clear that the manual was not sufficient and the photos were not sufficient because they failed to show that third status, and that third status is precisely what the examiner said was the point of novelty over the prior art of record. So by definition, with respect to the manual and with respect to the photos, they were not material to the 497 package. Was the manual submitted to the PTO? The manual was submitted to the PTO in reexamination of the 497 patent after in the BMW litigation, pursuant to a third-party subpoena, Honda produced the manual to BMW, and ACI got a copy, and that's the first indication that Mr. Obradovich, any of the inventors, or the prosecuting attorney ever had the manual. Now, with respect to the searching patents, two points. First, the jury determined that they had the RL, and they determined, and they played with it, they saw the manual, they saw the photos, they had all that in the jury room. They concluded that the searching patents were not invalidated in view of all that information about the RL, and the district court concludes that that material was highly material, so that's inconsistent with the jury's finding of non-obviousness. The second point is that Honda, and Honda's technical expert, Mr. Andrews, at trial, took the position that the Zeistra reference, which was disclosed and described in the specification, was an anticipatory reference, and that the RL only rendered it obvious. So, clearly, Honda's position was that the RL was not material because it was less relevant than the Zeistra patent. Now, the district court says that we're judicially estopped from saying that the Zeistra patent anticipates. Let me be clear. We have never said that Zeistra anticipates. Our point is that if Honda thought that the Zeistra reference was more material than the RL, then how can you infer intent if the patent attorney or the inventors may have come to the same conclusion? That certainly is a reasonable inference. Your Honor, with respect to the blue and yellow colors, they're not claimed. They're not involved in the patents claims that we're discussing. Your Honor, in any case, I only have five seconds left. Well, in the interest of fairness, I'm going to limit you to that period of time on your appeal, but I'll give you the two minutes that I gave Mr. Hillman to address his cross-appeal. Thank you, Your Honor. Let me ask one question pertinent to the original appeal. I wanted to ask you the same question that I asked your opposing counsel about the Bunn reference. Why didn't the statements with regard to the Bunn reference in the prosecution history erect an estoppel against the application of the doctrine of equivalence for the service provider patents? Well, Your Honor, particularly, and I call your attention in particular to the language quoted by the district court, that the service provider distinguishing Bunn on the ground that the service provider in a POS transaction is in response to a vehicle renter's selection of the service shown on display rather than in response to a vehicle condition determined by the processor. Yes, Your Honor. So one of the points of the service provider is that when you need service, it tells you that you need service, and then it says, do you want to find a place, you know, find nearest accurate dealer, and that's what you select. So the process began by the processor determining that some service was needed. In the Bunn reference, you don't have that. All you have is the user saying, oh, I want to select a service, so you select it. So there's no estoppel because the issue is what was patentable, part of what was patentable, was the issue that the system was initiating informing the user that there was a problem with the car. And our point is that just because the system then says, do you want to know the nearest accurate dealer, if you do press this button, that that action of pressing that button does not change the fact that there's a cause and effect relationship. The system sensed a problem, and it gives you the opportunity to find the nearest accurate dealer. You say that you want it, and you get it. In Bunn, there isn't that. All right. Okay. So with respect to the cross appeal. Mr. Jones, let's restart the clock to give him two minutes for the cross appeal. With respect to the cross appeal, the examiner found there what was patentable was the limitation of prompting, and it says prompting a user to select the option. Without that language, the examiner wouldn't allow the claims. Well, that's exactly what's missing in the Nihei and Mitsubishi references. And so what you have with both Nihei and Mitsubishi, the system is not prompting you to select the option. In fact, in Mitsubishi, if anything, it's prompting you not to get more information, because if you just press the button like you'd press any other button, it disappears. So you're being prompted to not get the information. And with respect to Nihei, the only indication is that with respect to the two keys, which appear to be unlabeled, if anything, they seem to be directing the prompting to silencing the alarm and not getting more information. So the systems are not prompting you to select the option that will get you more information. And without that prompting, even the prior article was disclosing screens, but it wasn't disclosing that prompt. How about the placement of thereby, thereby prompting? Is that instrumental in determining the meaning of that claim? Your Honor, if you mean should wait be given to what appears after thereby, there's no question that it has to have meaning, because the examiner did not allow the claims without that thereby clause. And when it was added, the examiner determined that it was patentable subject matter. Would it make any difference if thereby was after prompter, prompter thereby, a user, prompting a user, thereby? The position of thereby, I think, is very, very critical in determining that, even though we're trying to figure out the meaning of that claim. Is it? Your Honor, I've never considered whether it would be better if thereby was in a different place. What I have always felt was the most compelling argument is that the claims were not allowed until that clause was inserted for patentability reasons. And thus, it must have weight that for a system to render it obvious, such as Nihei or Mitsubishi, it would have to be prompting a user to select the option. Thank you, Mr. Butter. Mr. Hillman has three minutes on the cross-appeal. Very briefly, Your Honor. With respect to the prompting, our position is that the same amount of prompting is present in the prior art as it is in the sole embodiment of the patented suit. Their only argument to try to distinguish those is the fact that there is a button that allows you to opt out and decline the option. And they say, well, the user won't know which button to press. Or, in what I think is an even less persuasive argument, he's going to be prompted to not get the information, even though the whole point of this prior art is to give him the information. And Dr. Caird said the alarm would be too loud and he won't like it. And so, you know, it comes from a nuclear power plant. But, Mr. Hillman, the court said that there was something more to prompt, right? The court did say that, Your Honor. Now, if you take a look at that sentence structure, thereby prompting, does that location thereby make any difference to the structure of that claim? I'm not sure that it does, Your Honor. Again, I haven't thought about that issue. I'd have to go back and look at the language. But the central point, I think, is that regardless of whether you view prompting as a limitation or an explanation, the prompting was there in the prior art to a knowledgeable user. The only argument against it is that the user would be unable to pick between the option to get the information and the option to opt out of it and not do it. But that's true in the patent in suit as well. There are multiple options that appear in Figure 13 on the screen when the notable condition takes place. And unless the user was knowledgeable, he might well pick the option that says malfunction, thinking that that's what he's supposed to do. But the Patent Office allowed the claim after the amendment, adding thereby prompting. They did. But the argument that was made after that amendment was made was not about prompting. The argument was that the prior art didn't provide the option to get the coping information at all. It was the absence of the option, not the prompting, that was the basis of allowance. To use an analogy that all of us are familiar with, I suppose, and let me see if I understand exactly the way you understand what the district court did and what your position is. You go onto a website to download something and you're given this long license to read at the bottom of which it says I accept or I reject. Your interpretation of what the district court did here with respect to the term prompting, I take it, would be that if it says I accept, then you've been prompted to accept. But if it says I accept and another button says I reject, then you have not been prompted to accept. Is that the essence of what the district court said and you say that's wrong? That's pretty close. The additional thing I would say is that in the prior art, you've also been warned that there's a problem with your car. And you know that by taking your analogy, pressing accept, that's the only way you're going to get the information on how to deal with it. In my analogy, that's the only way you're going to get to download the software that you want to download. Exactly. And so of course there's prompting, even though you can decide not to do it. And that's basically our position in this, Your Honor. I think when the examiner required prompting language to be put into the claim, he was simply doing what examiners often do, which is the argument that was made included the word prompting and he didn't see it in the claim and he wanted to corrode. But the actual substance of the argument that was made was not about prompting. It was about whether the option was there in the first place. I think my obligation now is prompting. Thank you, Mr. Hillman. We'll take the case under advisement.